Leonard Strasberg, as Trustee, Respondent, *v.* Equitable Life Assurance Society of the United States, Appellant.

First Department, December 2, 1952.

*Eugene T. O'Neill* of counsel (*Valentine A. Meehan* with him on the brief; *Leo D. Fitzgerald,* attorney), for appellant.

*Louis A. Tepper* of counsel (*Ralph R. Weiser* with him on the brief; *Altschuler & Morrison,* attorneys), for respondent.

Cohn, J. This action was brought to recover death benefits under six life insurance policies issued by defendant in the total sum of $50,000 on the life of the insured. Each of the policies contains the following provision: '' Self-destruction sane or insane, within two years from the Date of Issue hereof, is a risk not assumed by the Society under this Policy.''

In *Franklin* v. *John Hancock Mut. Life Ins. Co.* (298 N. Y. 81) it was held that a policy clause such as the one quoted, excluding death by suicide is inoperative if the insured at the time of his suicide was so far insane as to have been without appreciation of the physical consequences of his action or without power to resist the disordered impulse that impelled him to end his own life.

Concededly the insured destroyed his life within two years after the issuance of the policies. Defendant claims that the insured was sane when he committed suicide. Plaintiff contends that the self-destruction was the result of insanity.

The issue was tried before a court and jury. At the close of the case defendant's motion for a directed verdict was denied and the case was submitted to the jury. The jury disagreed. Notwithstanding the failure of the jury to agree, defendant then moved for entry of judgment in its favor pursuant to section 457-a of the Civil Practice Act. This motion was denied. From the order thereon this appeal has been taken.

Thus the question for determination is whether there was sufficient legal evidence adduced by plaintiff to warrant a finding by a jury that the self-destruction of the insured resulted from insanity.

The policies of insurance were applied for by the insured pursuant to a property settlement under date of May 24, 1947, in lieu of alimony demanded by his first wife in an action for divorce brought by her. In December, 1948, the deceased remarried and was living with his second wife at a hotel in New York City. He was then forty-two years of age. Highly successful in the stock brokerage business, he was earning $100,000 per year. He was also a director of various power companies, as well as a trustee of numerous trust funds.

In the month of January, 1949, and prior thereto, the Securities and Exchange Commission was engaged in conducting an investigation of certain activities of the insured involving the manipulation of the securities of one of his customers, an investment trust. In collaboration with an employee of this customer, the insured learned in advance of intended purchases

of securities by the investment company. The insured then opened a series of personal accounts in the names of close relatives. Prior to executing trades or orders for the investment company, he himself bought those securities and placed them in the dummy accounts. Later he purchased them out of the dummy accounts, at a profit to himself, into the account of the trust. These highly irregular acts were soon discovered. The Securities and Exchange Commission commenced an action in the United States District Court for the Southern District of New York to enjoin him and his associates from continuing the improper practices. A criminal investigation by the Department of Justice was also in progress. As a result, on January 26, 1949, the deceased found it expedient to resign from his brokerage firm and also from various directorships and trusteeships.

On February 2d, of the same year, the insured drew a will which was admitted to probate after his death. The subscribing witnesses to the will made depositions in which they testified that the insured had testamentary capacity. At a conference held with his then attorney late in January, 1949, he had stated that he was considering various means of getting out of his difficulties including suicide. On February 11, 1949, a representative from the State Attorney-General's office attempted to serve process on him, but the insured evaded service.

Upon a pretext to his wife that he was going to Washington, D. C., the insured went to Newark, New Jersey, where on February 14, 1949, he registered at a hotel, under an assumed name. Two days later he was found in an unconscious state in his hotel room. Removed to a hospital, he died on February 19, 1949, without regaining consciousness. The cause of death was an overdose of sleeping tablets. (*Strasberg* v. *Equitable Life Assur. Soc.*, 277 App. Div. 430.)

The insured left three notes in his own handwriting. One was addressed to the management of the hotel directing it to deduct his bill from the money in his wallet and requesting it to notify three persons, his attorney, his brother-in-law and a close friend. He also asked that he be permitted to remain in the suite until necessary arrangements were carried out. The second note, addressed jointly to the three individuals, apologized for having them come out to Newark and requested cremation without any fuss. The third note, written to his wife in endearing terms, stated, among other things: '' It is the only way for me, cowardly though it may seem to be.''

None of the facts leading to the suicide suggests that the insured was irrational when he killed himself. Every step in his plan appears to have been coolly calculated.

In an effort to meet the burden placed upon plaintiff by the ruling of the Court of Appeals in *Franklin* v. *John Hancock Mutual Life Ins. Co.* (298 N. Y. 81, *supra*), to establish insanity by the deceased when he took his life, plaintiff called numerous witnesses who gave testimony to the effect that when quite young the insured had assumed the support of a large family; that his father's brother had committed suicide at an early age; that the insured was an extremely industrious man who slept only three or four hours a day and studied very hard; that he had an insatiable lust for money and would allow no moral principle to stand in his way; that he was earning enormous sums of money; that he was highly successful in the investment business; that he would become angry at trivial annoyances; that in playing cards he was a most belligerent person and was given to violent outbursts if dissatisfied with the playing of others; that on occasions he was irritable and aggressive; that upon suffering a business dismissal at one time he broke down and cried; that he would frequently change his plans of action with dramatic suddenness; and that he would exaggerate friendships. Plaintiff also called an expert witness, a physician and psychiatrist, who testified that he did not know the insured in his lifetime and that he never had treated him professionally. On the basis of a long hypothetical question propounded setting forth all the relevant testimony in the case, the doctor stated in his opinion, the insured was suffering from manic-depressive insanity and that he had a manic-depressive psychosis which was present from his mid-twenties up until the time of his death. The doctor, who, of course, had no personal knowledge of the facts, said that in his opinion, from the facts contained in the hypothetical question, the insured had formed an intent to take his life in January, 1949, as a means of exit from his difficulties; that he had this in mind, when he made his will on February 2, 1949, when he gave his wife large sums of money and left detailed instructions regarding his business affairs, and when he wrote farewell letters to his wife, his attorney, and his relatives; that the insured knew the consequences of. his act would bring sorrow to his wife and that taking sleeping tablets would result in his death.

However, it abundantly appears that the deceased, whose desire it was to become a great financier, had his lifetime ambi-

tion thwarted as a result of the illegal means which he had used to achieve success. He apparently knew that he would be barred from further transactions on the stock exchange; that he might be subject to criminal prosecution; and that the moneys improperly accumulated by his misconduct might have to be returned to the trust accounts. If we are to judge by his conduct and by what he stated in the letters written just prior to his death, the insured undoubtedly thought there was nothing left for him in this life. The manner in which the deceased planned his death indicates neither impulse nor insanity. It would be difficult to find a plainer case of intentional self-destruction with a clear knowledge of the consequences of one's act.

Insanity cannot be presumed from the mere fact of suicide for experience has shown that self-destruction is often perpetrated by the sane. (*Shipman* v. *Protected Home Circle*, 174 N. Y. 398, 405; *Roche* v. *Nason*, 185 N. Y. 128, 137.) The sanity of every person is presumed, for the reason that it is the normal condition of man. This presumption places the burden upon plaintiff, after the proof of self-destruction, to overcome that presumption and establish insanity (*Weed* v. *Mutual Benefit Life Ins. Co.*, 70 N. Y. 561, 563, 564). Other than the overwhelming objective evidence leading to the conclusion that the insured here consciously planned his self-destruction to escape the consequences of the difficulties in which he had been involved there is not the slightest credible proof that the insured at the time of his suicide was insane.

Words put in the form of an opinion uttered by a witness, even though he be an expert, cannot create an issue of fact when the factual basis for the opinion does not sustain his conclusion. The weight to be given a medical opinion where it is opposed to the facts, was discussed in *Matter of Horton* (272 App. Div. 646, affd. 297 N. Y. 891). There the court by Mr. Justice FOSTER made the following pertinent observation (pp. 650, 651): " The testimony of contestants' lay witnesses was too trifling in our judgment to sustain fraud, undue influence or lack of testamentary capacity; and the opinion testimony of the physician called by contestants was entirely belied by clear and convincing testimony as to conduct and acts on the part of the decedent that established his mental competency at the time he executed his will. Whatever may be ordinarily thought of the worth of a medical opinion, where it is contradicted by the facts, the facts must prevail (*Matter of Burnham*, 201 App. Div. 621)." (See, also, *Shallow* v. *Metropolitan Life Ins. Co.*, 278 App. Div. 328, affd. 303 N. Y. 827, and *Pettit* v. *Pettit*, 149 App. Div. 485.)

Where there is a policy of life insurance excepting liability thereunder if the insured dies by his own hands, and the insured commits suicide, it is incumbent upon the person seeking the benefits of the policy to prove that the self-destruction was not the conscious, voluntary act of one responsible for his action, but the involuntary act of an insane person. (*Weed* v. *Mutual Benefit Life Ins. Co.*, 70 N. Y. 561, *supra*.) Such proof is wholly lacking here.

In our view the expert testimony in this case, as well as the testimony of the lay witnesses is not enough to support a finding by a jury that the insured was insane when he committed suicide. The facts as disclosed by the record lead to the opposite conclusion.

Section 457-a of the Civil Practice Act as amended (L. 1949, ch. 604) so far as pertinent provides: '' The court may direct a verdict when it would be required to set aside a contrary verdict for legal insufficiency of evidence.'' According to plaintiff the most favorable inferences deducible from the evidence submitted at the trial, we hold that as a matter of law it would be insufficient to support a verdict in his favor. In the circumstances, the trial court should have directed a verdict for defendant. '' The court is justified in directing a verdict in such case ' not because it would have authority to set aside an opposite one, but because there was an actual defect of proof, and, hence, as a matter of law, the party was not entitled to recover.' (*McDonald* v. *Metropolitan St. Ry. Co.*, 167 N. Y. 66, 70.) '' (*Blum* v. *Fresh Grown Preserve Corp.*, 292 N. Y. 241, 245.) The order should be reversed and judgment directed in favor of defendant, with costs.

PECK, P. J., DORE and CALLAHAN, JJ., concur.

Order unanimously reversed, with costs and judgment is directed to be entered in favor of the defendant, with costs. Settle order on notice.